LAW OFFICE OF JEFFREY D. FULTON
Jeffrey D. Fulton, *pro hac vice*
2150 River Plaza Drive, Suite 260
Sacramento, CA  95833
Telephone:     (916) 993-4900
Facsimile:     (916) 441-5575
Email:          JFulton@JFultonLaw.com

WEINTRAUB TOBIN
Brendan J. Begley, *pro hac vice*
400 Capitol Mall, 11th Floor
Sacramento, CA  95814
Telephone:     (916) 558-6000
Facsimile:     (916) 446-1611
Email:  bbegley@weintraub.com

Attorney for Plaintiff
TERRANCE WALKER

UNITED STATES DISTRICT COURT

DISTRICT OF NEVADA

| | |
|---|---|
| TERRANCE WALKER,<br><br>Plaintiff,<br><br>v.<br><br>CHARTER COMMUNICATIONS LLC.,<br><br>Defendants. | CASE NO. 3:15-cv-0556-RCJ-CBC<br><br>SUPPLEMENTAL DECLARATION OF BRENDAN J. BEGLEY IN SUPPORT OF PLAINTIFF'S MOTION FOR A NEW TRIAL UNDER FEDERAL RULE OF CIVIL PROCEDURE 59 AND FOR RELIEF FROM JUDGMENT UNDER FEDERAL RULE OF CIVIL PROCEDURE 60(b)(3)<br><br>Trial Date:      November 4, 2019<br>Judge:           Robert C. Jones<br>Judgment Filed:  December 23, 2019 |

I, Brendan J. Begley, declare:

1.      I am an attorney duly licensed to practice law before all courts in the State of California, and an Appellate Law Specialist certified by the State Bar of California Board of Legal Specialization.  I am a shareholder at the law firm of Weintraub Tobin Chediak Coleman

Grodin Law Corporation, admitted pro hac vice as counsel for Plaintiff Terrance Walker ("Plaintiff") in the above-captioned matter.  I am submitting this supplemental declaration in support of Plaintiff's motion for a new trial and for relief from judgment, which was filed on January 21, 2020.  I make this declaration based on my personal knowledge. If called to testify, I could and would testify competently to the facts contained herein.

2.    This case was tried on November 4–6, 2019.  I was present during jury selection and the entire trial, including closing arguments.  Attached hereto is as **Exhibit F** is a true and correct copy of the official transcript of the defense's closing argument on the afternoon of November 6, 2019.  I was unable to provide a copy of this transcript when I filed my client's motion for a new trial and for relief from judgment on January 21, 2020, because I did not receive this transcript until January 24, 2020.

I declare under penalty of perjury under the laws of the State of California and of the United States that the foregoing is true and correct.

Executed on January 27, 2020, in Sacramento, California.

/s/ Brendan J. Begley<br>
Brendan J. Begley

**weintraub tobin** chediak coleman grodin
law corporation

# EXHIBIT F

UNITED STATES DISTRICT COURT
DISTRICT OF NEVADA
BEFORE THE HONORABLE ROBERT C. JONES, SENIOR DISTRICT JUDGE
---o0o---

TERRANCE WALKER, an          :
individual,                  :
                             :
            Plaintiff,       : No. 3:15-cv-556-RCJ-CLB
                             :
      -vs-                   : November 6, 2019
                             :
CHARTER COMMUNICATIONS       : Reno, Nevada
INC., and CHARTER            :
COMMUNICATIONS LLC,          :
                             :
            Defendants.      :
_____:


        TRANSCRIPT OF DEFENDANT'S CLOSING ARGUMENT


APPEARANCES:

FOR THE PLAINTIFF:        BRENDAN J. BEGLEY and
                          JEFFREY D. FULTON
                          Attorneys at Law
                          Sacramento, California


FOR THE DEFENDANTS:       CHRISTOPHER J. BANKS
                          Attorney at Law
                          San Francisco, California

                          JOSEPH D. HADACEK
                          Attorney at Law
                          Los Angeles, California


Reported by:              Margaret E. Griener, CCR #3, FCRR
                          Official Reporter
                          400 South Virginia Street
                          Reno, Nevada 89501

2

RENO, NEVADA, WEDNESDAY, NOVEMBER 6, 2019, 12:00 P.M.

---o0o---

MR. BANKS:  Well, folks, we're just about there. We are rounding the bend, as they say.

I want to thank you again for your time and attention.  As everybody has been saying, you know, we've seen that you're paying close attention to the witnesses, reading the documents, and we all really appreciate that because we all want you to get to the truth, get to the facts, look at the evidence, weigh the evidence, and come to your conclusions, and so thank you for your time and attention.

At the beginning I said, you know, thank you in advance for your time, and I said I look forward to coming back at the end and talking about how all the evidence fits together and talking about what you've seen.

Well, there's one question that you really have to answer here, and that is, did Mr. Walker prove his case.

We've talked about burden of proof several times today.  Well, the burden of proof for Mr. Walker's claims is on Mr. Walker.  That's why his lawyer gets to speak first, that's why he's sitting next to the jury and we're sitting over there.  That's why he'll get to have his lawyers speak at the end.

Because bearing the burden of proof is a serious

thing.  It means he has to prove that his claims are more likely than not true.  And I want to be clear, it means he has to prove that either his race was the only reason he was terminated by Charter, or that at least it was a motivating reason, it was one of the motives for why he was fired.

We only bear the burden of showing that if he proves on that second claim that it was one of the reasons why Mr. Larson and Ms. Perales, or Ms. Castillo now, made their decision, if you believe that, he's convinced you that they were motivated in part by his being African-American, then we bear the burden of showing, you know, if he hadn't been African-American, they still would have made the same decision.

We do not bear the burden of proving that our reason was correct, that we made the perfect decision, the best decision, the correct decision.  He has the burden of proving that the decision was a racist decision.

Ask yourselves when you're weighing the evidence has he proven that.  Has he proven that they were motivated by his being African-American.  Because to believe that you have to think that the same people who hired him, who promoted him for months, told people to look to him as an example, gave him an amazing review, gave him three weeks vacation, went and corrected mistakes made in his commissions, that those people waited secretly for, like, eight months for the chance to fire

4

him on account of his race.

There's no evidence that that's what happened.

So when you weigh the evidence, you're going to be looking on the one hand at Mr. Walker's testimony, and, on the other hand, there are documents in this case, documents like trial Exhibit 19.  That's Ms. Castillo's notes, her incident and milestone log that she testified she took contemporaneously.

It's not some secret log, some secret report. She wrote down things that happened, communications that took place between her and Mr. Walker.  These weren't secret communications, they happened between the two of them.  She then noted them.

So when counsel says they should have warned him, they should have told him what was going on, Ms. Castillo did.  Her notes are just a note that she did, a reminder of what had happened, but they're good evidence for all of us to help remember when these things took place because she did take those notes and she took them contemporaneously.

To believe Mr. Walker who says that these things never took place, you have to believe that Ms. Castillo went and fabricated those notes later.

There's also the incident investigation report, Exhibit 518, which catalogues parts of the information that are in the notes, both of the coachings that took place, the

prior incidents of insubordination that took place, but also catalogues her conversation with Adam Wagoner on the 24th of April, the day after the zero sales call, and the call that Ms. Castillo had with Mr. Walker herself.

Exhibits like Exhibit 21, the approvals done by neutral people, the supervisors who didn't even know Mr. Walker.  They looked at the evidence and they determined this is warranted.

You have to ignore the fact that six weeks before Mr. Walker was terminated there was another employee terminated, Dana Smith, for the same reasons, who similarly was terminated as a result of a decision by Ms. Castillo who was his supervisor and who conducted his investigation, that he had been insubordinate to her.

But, again, she conducted the investigation. They had to get approvals from the people in Stamford and other places, and they went through the same process, suspended him and terminated him a few days later.

So you have to ignore that, too, that they treated white employees the exact same way they treated Mr. Walker.

You have to ignore the testimony of Ms. Brenner. Ms. Brenner came here and sat on the stand.  She testified about what happened.

Counsel said we only brought two witnesses to

described what happened on the zero sales call?  We had four. Mr. Walker has the burden of proof here, not us.

We brought four people, including two people who no longer even work at Charter, one of whom who had to drive from another state to come here and testify for you and tell you what happened on that zero sales call.

One of those people is Ms. Brenner.  She came in, she testified she was the head of HR in the Reno office, the face of HR, she was involved in the decision to terminate.

She was also on the zero sales call.  She doesn't remember word for word what was said, but she believed what Mr. Walker had done was inappropriate.

I also want to remind everybody there was no decision to terminate based on the zero sales call.  That's not why he was terminated.  Mr. Walker was terminated because of the incidents that happened before the zero sales call, and, most importantly, the incident that happened after the zero sales call.

Counsel repeatedly said that Mr. Larson immediately wanted to terminate Mr. Walker.  There is no evidence of that.  Mr. Larson decided to move to a termination immediately after Ms. Castillo's one-on-one meeting with Mr. Walker, not after the zero sales call.

Every witness agrees, Ms. Brenner, Mr. Walker, Ms. Castillo, and the notes all show, that when she tried to

talk to Mr. Walker on the 23rd of April, coach him after the zero sales call, she told him they were thinking of corrective action, not to fire him.

He had a lot of chances to get off this train, and he didn't.  He was disrespectful on the call.  Yeah, he was going to get corrective action.  He was going to be disciplined.  He wasn't going to get fired over that.  But instead he escalated.  You heard from the witnesses on that.  So possible to believe Mr. Walker, you've got to ignore Ms. Brenner.

You have to ignore Mr. Ybarra.  Mr. Ybarra is one who came from California.  He testified about what happened on the call.  Both he and Mr. Walker described what was said on the call.  The notes described what was said on the call.

To say that we never introduced evidence of what was said on the call is not true.  What happened on the call is Mr. Ybarra, as he explained, asked, "Why weren't you in the field yesterday at noon?"

Mr. Walker, although he had been coached by Ms. Castillo to answer the question so they can move along, instead asks his own question and says, "Where are you getting that information?"  He testified to that, Mr. Walker did.  Mr. Ybarra said the same thing.

When Mr. Ybarra tried to ask other questions,

Mr. Walker did not answer them, and, instead, asked his own, and that is when he raised his voice.  Every witness we brought in here that was on that call said that Mr. Walker raised his voice except for Mr. Walker.  Even Adam Wagoner agreed Mr. Walker raised his voice.

So Mr. Ybarra came in, and he testified about what happened on the call.

Mr. Larson, of course, testified in this case.  He testified about what happened on the call; again, didn't remember it word-for-word but remembered the basic gist of it.

He explained that then when he spoke to Ms. Castillo right after the call, because remember he texted her or sent her a message, I guess, and said, "Come talk to me.  Get him off the call, come talk to me."

They talked.  He said, "I think you need to do corrective action."

She then goes, talks to Mr. Walker, and comes back and tells him the same thing that she told you on the stand, that she had a call with Mr. Walker, that he was confrontational, he became upset, that he claimed he was not going to be at Charter much longer, was no longer going to work more than eight hours a day, that he intended to be making millions and millions of dollars in his rice business, and that she could kiss his butt's butt, and then he hung up the phone on her.

That is when he started concluding, "I think this needs to move to termination."  And you heard both him and Ms. Castillo, the last and most important witness in this case, describe the deliberations they went through.

Counsel tried to get Ms. Castillo to admit that she had been pushed into this decision.  She said, "No, I wasn't pushed into the decision.  Mr. Larson was leaning towards termination, but he said, 'If you don't think that's right, make your case.'"  So she made her case.

And what did she say on the stand?  She said by the end she didn't even believe it herself.  She didn't believe that it should be a lesser form of discipline after she walked through the whole history, what happened on April 4th, her attempts to coach him on the 7th and on the 8th, what happened on the zero sales call, and, most importantly, what happened on her call with him afterwards.

So why did Mr. Walker lose his job?  He lost his job because he lost his temper.  He lost his job because he was insubordinate, and he lost his job because he was unprofessional, just like Dana Smith had lost his job six weeks before.

Now, the Court -- I'm going to go ahead and move past this.  The Court read a very important instruction to you about business judgment.  When you're deciding whether Ms. Castillo and Mr. Larson fired Mr. Walker either entirely

or in part because he was African-American, you have to remember that's the only question you're answering.

Could they have done a better job?  Is this the decision you would have made?  Would you have handled this decision a little differently?  None of those questions matter because the only question you're being asked to answer is whether they made a racist decision.

And it's said here in jury instruction number 17, the law requires that barring discrimination, meaning unless it's discriminatory, employers be given wide latitude. They're allowed to exercise their discretion, make their own decisions, to make personnel decisions without having to be concerned that their business judgments will be second guessed by a jury in court.

Employment decisions involve proper, subjective, and discretionary factors, and it is not the function of the jury to substitute its judgment for that of the employer.  In other words, if you would have made a different decision, that's okay, but that doesn't make them liable for race discrimination.

Then it continues, the jury's only duty is to determine whether the defendant intentionally discriminated against the plaintiff on the basis of race.

It can't be something in the back of their mind they're not aware of, it has to be intentional discrimination.

Thus you are not to consider whether the defendant made a decision that was fair, or proper, or was a prudent business decision.  Even if you believe that the defendant made a decision that was incorrect or unfair or one that you would not have made, you must find for the defendant unless you conclude that it decided to terminate the plaintiff's employment because of his race.

There's no evidence that his race had anything to do with their decision.  They made the same decision with a white employee six months before.

They were also going to discipline Adam Wagoner, remember?  He talked about that, that they told him he was a dark cloud or a black cloud or something.  Yet what happened in his meeting when he had a one-on-one?  I guess it was a one-on-two.  He was meeting with both Ms. Perales, as she was known then, and Mr. Ybarra.

Mr. Wagoner apologized and said it won't happen again.  If Mr. Walker had done that, it probably would be a different story here today, but that's not what he did.

So Charter takes unprofessional conduct seriously.  It took this situation seriously just like it did with Dana Smith.  That's why Mr. Walker doesn't have a job.

I want to go through this kind of quickly, but I want to help everybody remember who's who.

Ms. Castillo, formerly Ms. Perales, that's the

name you'll see in the documents.  Remember, she's the one who hired Mr. Walker on the spot, hired him on the same day, gave him a glowing review, got him his three-week leave.  Trial exhibit 19 is her notes.

She tried to coach Mr. Walker repeatedly.  Again, those are not secret.  That happened one-on-one between the two of them.  She wrote it down in trial Exhibit 19.

And when she decided that it was appropriate to terminate Mr. Walker, she decided that after looking at all the evidence.  It wasn't a rush to decision, she thought about it carefully.

She also is the one who terminated Dana Smith, the white employee, for the same reason six months before.

Mr. Larson, of course, was the direct sales manager in Reno.  He is a witness to the zero sales call just like everybody else was in this case.

He had recommended corrective action, not termination, initially after that zero sales call.  It was only after the one-on-one between Mr. Walker and Ms. Castillo that they came to the conclusion that termination was appropriate.

Mr. Ybarra was a coworker with Ms. Castillo.  The two of them were both direct sales supervisors, and he ran that call on April 23rd, 2014, which was the first call that day, the zero sales call.

13

And, of course, Mindi Brenner, the human resources generalist who worked in Reno during this time.  She witnessed the zero sales call as well.

She's the one who advised on the termination.  She approved it, found nothing wrong with this.  She also advised on the termination of Dana Smith and confirmed the consistent treatment between the two.

Mr. Walker was really good at sales at first.  Everybody agrees on that.

Now, something that counsel said in opening, he said, you know, that Mr. Larson turned on Mr. Walker because Mr. Walker had raised his voice, and he was an African-American on the zero sales call, and that's why he immediately wanted to terminate him.  I've already said that he didn't immediately want to terminate, it was only after the one-on-one call.

But beyond that, remember all the documents they introduced where Mr. Walker had raised questions about his commissions and things like that back in '13 and '14?  He was certainly asserting his rights.  Mr. Larson didn't fire him then.  He didn't have any problem with it.

If he had a problem with an African-American person asserting their rights, he certainly didn't show it for eight months, and he hasn't shown it in any of his other experiences either.  You heard he works with a lot of

African-American DSRs, and he's not ever been accused of racist treatment by anyone other than Mr. Walker.

Mr. Walker, by the end, though, he just kind of checked out.  I'm not saying he did a terrible job, he wasn't being disciplined for performance.  He had been warned a couple of times that he needed to get his numbers up.  He had talked about that, said he would get his head back in the game.

But it was clear by the end he was thinking more about his rice business than he was about Charter, and that probably motivated why he was no longer being very respectful of people at Charter.

He never made any allegation of discrimination at Charter until he was suspended.  That was the first time he ever raised such a thing.

He denied almost everything in the case, right?

Remember he said that he never raised his voice on the April 4th call?

He said that he didn't refuse to call a customer on the April 4th call.

He said the coachings on the 7th and 8th are fabricated, those never happened.

He said that he never raised his voice on the zero sales call.

He said he didn't raise his voice with

Ms. Castillo on the one-on-one call.

He says, "I didn't tell her to kiss my butt's butt," even though she told everybody this right after the call and has no reason to make that up.

I mean, she was making money off him, right? She wanted to keep him on the job. She was against termination at first. Why would she make up such a weird phrase? This is a classic credibility contest. Who do you believe, Mr. Walker or everybody else?

So he denied almost everything, claimed he never communicates aggressively or unprofessionally. But you remember in his testimony, how many times did we have to go back to his prior deposition and read other testimony that he had previously given under oath that he was denying on the stand here this week.

And, of course, credibility is a very important thing, and there's an instruction on this, jury instruction number six, and you can consider witnesses's credibility, and that you have to, right? Because you've got people telling very different stories here.

Mr. Walker denies almost everything that everybody else says happened. So you're going to have to make a decision who is telling the truth here. Jury instruction number six gives you some guidance, reminds you that sometimes people are just describing the same thing a little bit

differently, different shades of the same event.

Sometimes people don't remember perfectly. That doesn't mean that you have to conclude that they're complete liars, right? But sometimes it's more serious than that. That's why the instruction continues,

"However, if you decide that a witness has deliberately testified untruthfully about something important, you may choose not to believe anything that witness said, or, on the other hand, if you think the witness testified untruthfully about some things and told the truth about others, you may accept the part you think is true and ignore the rest."

So you're going to have to weigh all that evidence and think who is telling the truth about what happened on the one-on-one call between Mr. Walker and Ms. Castillo.

Is it true that Mr. Walker never communicates unprofessionally, that he's never aggressive in his communications, especially his written communications?

Well, you can also take a look at Exhibit 526 to assess his credibility on this. Exhibit 526 is the e-mail he wrote to Mr. Hadacek and another one of my colleagues wherein he wrote, "Please don't scream rape like a typical racist white lady, or even say that I tried to flirt with you in the

fashion as the white woman who got Emit Till killed.  If you are antagonized or in fear of me, it is because of the white supremacist indoctrination that you have received living in this society that you have failed to shed due to the lack of your education."

And he continues, refers to Martin Luther King and says, "that's another very threatening and fearsome black man I would presume in your minds," accusing them of thinking Mr. Martin Luther King is a fearsome black man.

And he talks about, "You and your client's white fragility, rampant use of deception in this matter, as well as shallow white supremacist techniques."  And he said I was using white supremacist techniques on the stand.

THE COURT:  I'm sorry to interrupt, but I just remind you, you may only consider that evidence on credibility, not on Mr. Walker's character or propensity, only on Mr. Walker's credibility.

MR. BANKS:  Exactly, and that is my point, is that when he says, "I don't communicate unprofessionally or aggressively," you have to assess his credibility on that and whether that's a correct and true claim.

Well, so what are Mr. Walker's responses to all the evidence in the case that he had acted unprofessionally? He has three responses.

The first is, "I didn't do it.  It's not true."

18

The second is, "I wasn't warned enough."

And the third is, "It's Chris Larson's fault. He pushed Ms. Castillo into this termination.  He was motivated by my race, and he pushed her into this."

Well, with respect to the I-didn't-do-it response, that means again you've got to conclude that Ms. Castillo lied on the stand, Mr. Larson lied on the stand, Mr. Ybarra lied on the stand, Ms. Brenner was lying on the stand, and that somebody fabricated a whole lot of documents, because every witness except for Mr. Walker testified consistently about what happened.

I agree, Mr. Wagoner didn't think that the raising of the voice was that bad on the zero sales call, but even he agreed Mr. Walker raised his voice, and Mr. Wagoner, of course, didn't know about any of the incidents before, and he had no idea what happened on the one-on-one call.

You've got documents that go back throughout the entire history of Mr. Walker's employment here.  You have the reports that were generated, so you have to believe that all of those are lies.

I do not want to read all these documents to you again.  I've done it before, but I want to remind you which ones are the important ones.

Exhibit 19.  Exhibit 19 describes what happened back in November 2014 when Mr. Walker and a sales -- or a tech

19

operations supervisor had disagreements about what happened on their call, right, about who was yelling at who.  It was a warning sign, and Ms. Castillo testified she warned Mr. Walker at the time, she counseled him, "Be careful," you know, "you've got to talk professionally to these guys."

You heard the evidence of course, about Mr. Smith and his termination.

You heard the evidence that Mr. Walker was reminded a few times, just like all the DSRs were, when they should be out in the field, that they should not leave early. Yet a week later, on the 4th of April, you heard again the evidence that Mr. Walker had a call with Ms. Castillo when she went looking for him in the field and couldn't find him.  She drove out there expecting to see him knocking on doors and he wasn't there.  Instead, he was on his way to Vegas.

She asked him to please call a customer, let them know there's going to be a delay in their installation, and he wouldn't do it.  He talked over her, he interrupted her, he raised his voice, so she finally had to end the call and say, "Fine, I'll do it myself."  That's in her notes, Exhibit 19, and it was in her testimony.

She had coachings then the next week and said that's not professional behavior, as well as talking about his performance.  That's in the notes.  That was in Ms. Castillo's testimony.

Again, I don't want to read all this again.

The April 23rd incidents, and, again, there are two calls on the 23rd of April, not one.  There was first the zero sales call.  You heard from every witness in this case about what happened on that call.

All six witnesses testified, and the consensus -- I shouldn't say the consensus, everybody except for Mr. Walker testified that he raised his voice.  Some people had more clear recollections of exactly what was said and what wasn't said.

But there's also documentation.  Exhibit 518 is the investigation report, details what happened on the call, and Exhibit 19, which is Ms. Castillo's incident and milestone log, also has details as to what happened on that call back at the time, right?  They wrote it down at the same time.  It's going to have more detail to refresh your recollection.

I won't walk through it, but remember April 23rd there's then the second call with Ms. Perales, as she was known at the time, and she and he had a call.

Again, he raised his voice and got upset, told her he was going to make millions of dollars, he wasn't going to work the same hours any more, and then he told her to kiss his butt's butt, and then he hung up the phone, and that is what led to his termination.

It's written down in Exhibit 19, and it's

21

written down in Exhibit 518.  So you know kind of blow-by-blow what happened on these calls.  It's all written down.

So the second response is Mr. Walker's I-wasn't-warned-enough-response, "so I shouldn't have gotten fired," and that means "they decided to fire me because I'm African-American."

Folks, how many times does an employee need to be told not to tell their boss to kiss their butt's butt? Zero.  This isn't rocket science.  Nobody should be talking to their supervisor that way.  There are policies in place at Charter about this, right?

So he shouldn't have needed to be told don't get mad at your boss on the phone, don't yell at them, don't tell them you're going to go make millions of dollars doing something else, don't hang the up the phone on them.  These are all obvious things that anybody in the workplace should know.  He didn't need to be warned not to do that.

And that's enshrined in the policies, right? Trial Exhibit 2 is the corrective action guidelines, and it explains some things -- we don't have to go through all these different steps.  They're serious, right?  And in this case it includes insubordination in violation of the professional conduct policy.

And we've read both of those a few times, right? The professional conduct policy is page 54 of Exhibit 3, and

it explains don't raise your voice against people at work, don't be insubordinate towards your supervisors.  Again, these are things that are kind of obvious, but they're set forth in the policies, and they explain you can move to immediate termination, which is what happened to Mr. Walker and it's what happened to Mr. Smith.

But even though I don't think Mr. Walker needed to be warned, he was warned, right?  He was warned in the employee handbook which he said he read very carefully when he started the job, page 54 of Exhibit 3.  You've seen this a few times, I'm not going to read it again.

He was warned on November 14, 2013, after the incident with the tech operations supervisor, you know, be careful how you're talking to people.

He was warned after the April 4th incident on the 7th and the 8th.

And then, of course, Ms. Castillo called him on the 23rd after the zero sales call.  That was supposed to be a call that was coaching and a precursor or an indication that he was probably going to receive corrective action.  This was an attempt to defuse the situation, address it, nip it in the bud.

So they say, "Why didn't you try?  Why didn't you go sit down with him?"  Well, Ms. Castillo did.  What else was she supposed to -- I mean, how many times do you have to

23

go to someone and say talk nicely to people, right?  She had done it a few times before.  Now she's doing it again, and what's the response she gets?  "Kiss my butt's butt," and hang up phone.

All right.  The last response is this sort of idea that Mr. Larson is the bad guy, right?  It's all Mr. Larson's fault.  He made Ms. Castillo do this.  He's a bad guy.  He secretly laid in wait for eight months to fire someone on account of their race.

Well, Mr. Larson is not the only one who made the decision, right?  You've also got Ms. Castillo and Ms. Brenner advised on this as well.  They all approved it, they all agreed this was the right thing to do.

It was a joint decision.  It was carefully considered.  It was not a rush to judgment.  Mr. Larson did not immediately conclude after the zero sales call there should be a termination.  He said there should be corrective action.

After the one-on-one call, yeah, he was immediately at that point leaning towards termination, but he gave Ms. Castillo a chance.  "Make your case.  You don't want to fire him, make your case," and she said at the end she didn't even believe that case.

And they agreed, you can't make a special exception and allow someone to be a jerk in the office just

—24—

because they made good sales, right?  That's fairness.  Don't make special exceptions for people just because they make a little more money for us than other people do.  It's not a reason to abuse your coworkers.  It's not a reason to hang up the phone on people.  We can't excuse and tolerate that behavior even though you've otherwise been a good employee.  This is not acceptable, and you've been warned before.

Again, it wasn't immediate.  He was only going to get a corrective action at first.  I said it -- this was not a runaway train that was -- you know, they were aiming to fire him.  They didn't want to fire him.  They gave him chances to get off, instead he escalated.

It wasn't rubber-stamped by management.  They required all the details.  They said, you know, just that phone call, those two phones calls is not enough.  Did you talk to him before?  What else?

So they went back, they got the information from the logs to show that, yeah, there's warnings beforehand on April 4th, 7th, 8th, and there was the additional information that Mr. Castillo learned the next day on the 24th from Mr. Wagoner.

Mr. Wagoner didn't remember this, but Ms. Castillo sure did.  She said, "I don't know why Adam Wagoner doesn't remember this, but it happened.  I talked to him that day.  He told me that they had spoken, Mr. Walker and

him had spoken, Mr. Walker intended to keep doing this.  They didn't like the zero sales calls."

And you heard Mr. Wagoner, right?  He did not like the zero sales calls, he thought they were all demeaning, he thought they were all horrible.  He got disciplined or almost disciplined over this.  He got coached, he apologized, he wouldn't do it again.  So they didn't take it further with him.  Mr. Walker went the other direction, he escalated.

So just remember also the comparison.  If there were any mistakes made in the way this was handled, they were the same mistakes that were made with Dana Smith, right?  And you know these two were treated the same.  You haven't heard any evidence to the contrary.

Adam Wagoner was also going to get disciplined for the way he was behaving, right?  But instead of escalating it and moving it up towards a termination like Mr. Walker did, he backed down and said, "I'm sorry, I won't do it again." That's how they would have treated Mr. Walker, too, if he had handled it appropriately.

So why was Mr. Walker terminated?  He was terminated because he lost his temper at work and violated the policies.  Remember when you're deliberating, white employees were treated the same, and also remember that the person who decided to terminate Mr. Walker's employment, Ms. Castillo, she's the same person who hired him, promoted him, said great

26

stuff about him, gave him am awesome review, got him his three weeks off.

Also, Mr. Larson, the same person who received e-mails from Mr. Walker throughout the time Mr. Walker worked there asking him to fix things in his commissions, and, as Mr. Larson explained, he did.  He didn't have a problem with that.  This wasn't somebody who was out to get Mr. Walker.

At the end of the day Mr. Walker's termination had nothing to do with him being African-American.  It had to do with his violation of the policies, it's as sample as that.

I need to address damages just a little bit, but before I do let me just quickly walk through the jury instructions.  You've heard them before, but I want to emphasize.

There are two theories here for Mr. Walker.  He can prove his claims if he establishes with you by a preponderance of the evidence, so after you weigh all the evidence, testimony, exhibits, et cetera, if you are convinced that he was terminated for the only reason being that he was African-American, he wins.

He has a second theory.  That's motivating factor, that one of the motives for their termination was because he was African-American.  Okay?  And if he convinces you of that, he might win.  But there's a second issue to that.

So if he proves that, that that was one of the motives, one of the reasons they did this, and they also had some other motive, if we are able to establish that even if he had been white or some other, you know, nationality or race, that they still would have terminated him anyway, that despite having a bad motive that they still would have fired him even if they had a bad motive, if you're convinced of that, then he doesn't win on the motivating factor.

I don't think you have to get there, right? It's not a motivating factor. There's no evidence, not a shred of evidence that these people cared a bit about the fact he was African-American, right?

I mean, there's no stray comments, nobody made a joke about African-Americans, nobody made a comment about African-Americans, nobody else has ever complained about anything that these people have ever done towards African-Americans, or ever said about African-Americans. There isn't a shred of evidence that that was any motive for them and why they let him go.

And, remember, Charter is a corporation. Still, give it the fair treatment. It's made up of people. They're the ones who act, think what they were thinking. Was this why they were doing what they did? Did they fire him because he's African-American? That's the question.

And the business judgment instruction number 17,

I ask you read that again.  It's on damages.  Mr. Walker has the burden of proving his damages.  All I can say is, based on his testimony, I don't have any idea how he calculated his damages.  They walked through it a little bit in closing and tried to explain the calculations.

But there's something really important that you've got to remember in doing these calculations.  We've also got this affirmative defense of mitigation.  What does that mean, right?  Mitigation means that the plaintiff has a duty to use reasonable efforts to mitigate damages.  To mitigate means to avoid or reduce damages.

You know that by January 2015 he had a job at Nielsen, right?  Apparently he made $32,400 that year from his job in 2015 because that's what we heard just a little bit ago.  He only worked there -- he quit in August, so sometime in January to sometime in August, so maybe seven months he worked there, and then he quit.

Do you remember why he quit?  Because he thought he was going to go make a bunch of money in his rice business.  I had to read from his deposition on it.  That was what he had said under oath back in 2016.

So why -- Charter shouldn't be on the hook for the fact that he had a paying job and decided to quit, right?  Did he mitigate his damages?  Did he do what he should have done to avoid his damages of lost wages?  He decided to make a

29

bet at that time, right?  That he could make more money in his own business.

It looks like he made some money in his own business, doesn't look like he made as much.  That's not our fault.  So when you're evaluating damages, think about mitigation.

I should say I don't think you need to think about damages at all.  If you get to damages for any reason, and you want to think about this, damages should stop in January of 2015.  He had a job, he quit that job on his own.

So end the day, though, I think the most important thing here to remember is that there is no evidence that Mr. Walker was terminated on account of his race. There's not any evidence that it was a motivating factor at all for Ms. Castillo or Mr. Larson or anybody else in this case.  They terminated him because of the way he had acted on those phone calls and primarily towards Ms. Castillo.

Thank you.  Thank you very much for your attention, and thank you for your deliberations in advance, and thank you all for being here.

-o0o-

I certify that the foregoing is a correct transcript from the record of proceedings in the above-entitled matter.

/s/Margaret E. Griener        1/16/2020
 Margaret E. Griener, CCR #3, FCRR
 Official Reporter